rFactr, Inc. v. McDowell, 2020 NCBC 89.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 12299

RFACTR, INC., RICHARD
BRASSER, and GREG GENTNER,

        Plaintiffs,

v.

CHRIS MCDOWELL and
CAROLINE MCDOWELL,

        Defendants.

**ORDER AND OPINION ON
PLAINTIFFS' AND DEFENDANTS'
MOTIONS FOR SUMMARY
JUDGMENT AND DEFENDANTS'
AMENDED MOTION TO STRIKE
AND/OR PRECLUDE RELIANCE ON
AFFIDAVIT OF LUIS GOMEZ**

1. Before the Court for decision are four motions:

(i) Plaintiffs/Counterclaim-Defendants Richard Brasser ("Brasser") and Greg Gentner's ("Gentner") Motion for Summary Judgment on Plaintiffs' Affirmative Claims (the "Brasser/Gentner Motion"), (ECF No. 76);

(ii) Brasser and Gentner's Motion for Summary Judgment on Counterclaims (the "Brasser/Gentner Counterclaim Motion"), (ECF No. 78);

(iii) Plaintiff/Counterclaim-Defendant rFactr, Inc.'s ("rFactr" or the "Company") Motion for Summary Judgment as to rFactr's Claims and Defendant/Counterclaim-Plaintiffs' Counterclaims (the "rFactr Motion"), (ECF No. 84); and

(iv) Defendants Chris and Caroline McDowell's (the "McDowells" or, respectively, "Chris" and "Caroline") Amended Motion to Strike and/or

Preclude Reliance on Affidavit of Luis Gomez (the "Motion to Strike"), (ECF No. 96), (collectively, the "Motions") in the above-captioned case.

2. This case arises out of Caroline's October 2017 telephone call to Jackson National Life Insurance Company ("Jackson National"), in which Caroline is alleged to have falsely represented that rFactr, a company with outstanding Internal Revenue Service ("IRS") liabilities and with which Jackson National was negotiating a contract, was financially unstable. Soon after the call, Jackson National informed rFactr that it no longer wished to pursue negotiations or enter into a contract with the Company. Plaintiffs subsequently filed suit against the McDowells, asserting claims based on Caroline's call and contending that the call was the sole reason that Jackson National did not enter a contract with rFactr.

3. The McDowells have asserted counterclaims in response, alleging, among other things, that Plaintiffs misrepresented the Company's financial condition to induce the McDowells' investment in the Company and that Brasser and Gentner breached their fiduciary duties to the McDowells by misrepresenting rFactr's financial condition, paying themselves excessive and unreasonable salaries, and otherwise diverting corporate resources for their personal benefit.

4. After considering the Motions, the briefs and related materials submitted in support of and in opposition to the Motions, and the arguments of counsel at the hearing on the Motions, the Court **GRANTS in part** and **DENIES in part** the Motions.

*James, McElroy & Diehl, P.A., by John R. Buric and John R. Brickley, for Plaintiff rFactr, Inc.*

*Lincoln Derr PLLC, by Sara R. Lincoln and Phoebe Norton Coddington, for Plaintiffs Richard Brasser and Greg Gentner.*

*Rosenwood, Rose & Litwak, PLLC, by Erik M. Rosenwood and Carl J. Burchette, for Defendants Chris McDowell and Caroline McDowell.*

Bledsoe, Chief Judge.

## I.

## FACTUAL BACKGROUND

5.     The Court does not make findings of fact when ruling on motions for summary judgment. The following background, drawn from the evidence submitted in support of and in opposition to the Motions, is intended only to provide context for the Court's analysis and ruling.

6.     The McDowells met and befriended Brasser in the mid-2000s. (Dep. Chris McDowell 26:24–27:9 [hereinafter "Dep. Chris"].)[1] In 2011, Brasser approached the McDowells to discuss a possible investment in his company—The Targeted Group, Inc. ("Targeted Group"). (Dep. Chris 27:12–25.) At that time, Brasser told the McDowells that Targeted Group was in the business of "social media in the context of business to business selling," (Dep. Chris 35:20–21), and that he was in the process of securing angel investors and multi-level marketing groups and had already secured customers, including Amway, (Dep. Chris 36:15–21, 53:22–55:8).

---

[1] Excerpts of the deposition of Chris McDowell are located at ECF Nos. 82.1, 108.2, and 109.2.

7. Chris, Caroline, or both[2] subsequently invested $65,000 in Targeted Group preferred stock on October 26, 2011 from funds held in their joint bank account. (Aff. Chris ¶ 3, ECF No. 94; Dep. Chris 222:17–226:22.) These shares were evidenced by a stock certificate issued in Chris's name. (The Targeted Group, Inc. Stock Certificate [hereinafter "TGI Certificate"], ECF No. 83.2; Dep. Chris 224:4–17.) Although Brasser had represented to Chris in soliciting his investment that Amway was a significant Targeted Group customer, Chris discovered after his investment that Amway had never been a Targeted Group customer. (Dep. Chris 54:22–55:8.)

8. In May 2013, Targeted Group changed its name to rFactr, resulting in the conversion of all of Targeted Group's shares into rFactr shares. (Aff. Greg Gentner ¶ 7 [hereinafter "Aff. Gentner"], ECF No. 80; Articles Restatement The Targeted Group, Inc., ECF No. 80.1; Aff. Richard Brasser ¶ 7 [hereinafter "Aff. Brasser"], ECF No. 79; rFactr, Inc. Stock Certificate [hereinafter "rFactr Certificate"], ECF No. 83.3.) Afterward, Chris learned that the Company had large debts it had retained from Targeted Group—debts Chris had asked about and that Brasser had not disclosed in soliciting Chris's investment. (Dep. Chris 50:14–51:8.)

9. In 2015, Chris, Caroline, or both made a second investment in rFactr from funds held in their joint bank account, this time investing $25,000 in an rFactr convertible note. (Aff. Chris McDowell ¶ 4 [hereinafter "Aff. Chris"].) Prior to this investment, Chris asked Brasser whether rFactr had any outstanding debts that

---

[2] The parties dispute who actually purchased the Targeted Group shares. The determination of that issue is not material to the Brasser/Gentner and rFactr Motions but, as discussed *infra*, is material to the resolution of the Brasser/Gentner Counterclaim Motion.

could negatively impact the Company's ability to pay the note. Brasser responded that the Company did not have any outstanding debts and that the investment would be used to pay standard business expenses and grow the Company's customer base. (Aff. Chris ¶¶ 8–10.)

10. Chris joined rFactr's Board of Directors in or around March or April 2015. (Dep. Chris 244:8–15.) While serving on the Board of Directors, Chris often worked from home and conducted confidential business calls on speakerphone that Caroline could and did hear from time to time. (Dep. Chris 14:2–15:4; Dep. Caroline McDowell 129:15–130:12 [hereinafter "Dep. Caroline"].)[3] Caroline also had access to Chris's work email, which she accessed using a password Chris commonly used. (Dep. Chris 11:21–12:19; Dep. Caroline 139:21–140:12.) Although Caroline had used Chris's account previously with his approval to make travel reservations, and while Chris knew Caroline had access to his email account, Caroline also regularly read Chris's work emails without his knowledge, marking them as "unread" to hide her actions. (Dep. Chris 11:21–12:19; Dep. Caroline 141:16–142:24, 146:2–13.)

11. It was also in 2015 that rFactr and Jackson National entered into negotiations for a multi-year license for certain rFactr software. These negotiations continued into the fall of 2017, and by that October, rFactr and Jackson National were preparing a Master License and Services Agreement and Statement of Work. (Aff. Chris ¶ 18; Aff. Gentner ¶¶ 14, 20; *see* Draft Master License & Services Agreement & Statement of Work, ECF No. 80.3.)

---

[3] Excerpts of the deposition of Caroline McDowell are located at ECF Nos. 82.2, 107, and 108.3.

12. During the period of these negotiations and extending back to 2013, rFactr struggled financially and suffered substantial losses. (*See* rFactr Investor Update Email Aug. 11, 2017 [hereinafter "rFactr Investor Update"], ECF No. 94.5.) The Company ultimately could not afford to pay its creditors or business expenses. (Aff. Chris ¶ 17.) Indeed, rFactr's failure to pay federal taxes prompted the IRS to file tax liens against the Company, (*see* Aff. Gentner ¶¶ 11–12), and rFactr's federal tax liability became substantial.[4]

13. On October 26, 2017, Caroline initiated the telephone call to Jackson National that is at the center of Plaintiffs' claims. It is undisputed that she made several statements in the call, including that she was a former employee of rFactr named Susan,[5] that rFactr was about to be seized by the IRS, and that rFactr's owner or Chief Executive Officer ("CEO") was being investigated for arson of his home. (Audio Recording Phone Call, ECF No. 82.3; *see also* Dep. Caroline 194:15–196:8, 229:22–230:2.)

14. The Jackson National representative who answered her call then transferred her to Jeffrey Mitchell ("Mitchell"), a senior human resources business consultant for Jackson National. (Dep. Jeffrey Mitchell 5:12–18, 11:1–9 [hereinafter

---

[4] Brasser and Gentner disclosed the IRS liabilities to the Company's board of directors for the first time in June 2017 when rFactr owed over $900,000 to the IRS. (Aff. Chris ¶¶ 14–16.) Two months later, rFactr disclosed to its investors that it then had significant outstanding IRS liabilities of $720,000. (rFactr Investor Update.)

[5] Caroline testified that she lied about her identity to keep her involvement secret from Chris. (Dep. Caroline 192:11–193:12.) Chris did not learn that Caroline made the call to Jackson National until December 2017. (Aff. Chris ¶ 23.)

"Dep. Mitchell"].)[6]  Caroline told Mitchell that she used to work for rFactr, (Dep. Mitchell 11:23–12:8), rFactr's owners were in financial trouble, (Dep. Mitchell 16:3–6), rFactr was in trouble with the IRS, (Dep. Mitchell 16:7–8, 17:6–10), rFactr's CEO was under investigation for arson, (Dep. Mitchell 16:8–9, 17:19–18:1), and rFactr's owners had withdrawn their children from school and were leaving the country, (Dep. Mitchell 16:9–11, 19:24–20:15).  Mitchell thought the call might be a prank or phishing and did not investigate Caroline's accusations, (Dep. Mitchell 18:14–25, 21:18–22), but nonetheless reported the call to Jackson National's in-house counsel, (Dep. Mitchell 20:20–21:13, 27:16–28:16).

15.    The following day, Luis Gomez ("Gomez"), Jackson National's Vice President of Marketing and Digital Strategy and one of its principal business contacts with rFactr, (Aff. Gentner ¶ 28; Aff. Luis Gomez ¶ 1 [hereinafter "Aff. Gomez"], ECF No. 77), emailed the Company to advise that Jackson National had "decided to move in another direction" and that it would discontinue its contract negotiations with rFactr, (Aff. Gentner ¶ 29).  Brasser initially suspected that Jackson National terminated negotiations because it had discovered rFactr's substantial IRS tax lien.  (Email Richard Brasser Oct. 27, 2017 [hereinafter "Oct. 27 Email"], ECF No. 79.5.)  It was months later when Brasser and Gentner learned of Caroline's call to Jackson National.  (Aff. Brasser ¶ 30; Aff. Gentner ¶ 30.)

---

[6] Excerpts of the deposition of Jeffrey Mitchell are located at ECF Nos. 82.4 and 106.2.

## II.

## PROCEDURAL BACKGROUND

16. rFactr initiated this action on June 21, 2018 soon after Brasser and Gentner learned of Caroline's October 2017 call to Jackson National. (Compl., ECF No. 123.) rFactr subsequently amended its complaint on August 16, 2018, (First Am. Compl., ECF No. 3), and again, with leave of court, on October 25, 2018 to add Brasser and Gentner as Plaintiffs, (Second Am. Compl [hereinafter "Compl."], ECF No. 16). rFactr asserts claims against the McDowells for tortious interference with prospective economic advantage and unfair or deceptive trade practices under N.C.G.S. § 75.1-1, and a claim against Chris for breach of fiduciary duty. (Compl. ¶¶ 84–88, 97–104, 105–09.) Brasser and Gentner assert a defamation claim against the McDowells. (Compl. ¶¶ 89–96.)

17. In response to Plaintiffs' Second Amended Complaint, on November 27, 2018, the McDowells asserted counterclaims against (i) rFactr for shareholder inspection under N.C.G.S. § 55-16-02 and for breach of contract, (ii) Brasser and Gentner for breach of fiduciary duty and fraudulent misrepresentation/concealment of material fact, and (iii) rFactr, Brasser, and Gentner for constructive fraud. (McDowells' Answer Pls.' Second Am. Compl. & Countercls. Against rFactr, Inc., Richard Brasser, & Greg Gentner, ¶¶ 98–109, 110–18, 119–27, 128–36, 137–47 [hereinafter "Answer"], ECF No. 18.)

18. Brasser and Gentner filed their Motions for Summary Judgment on June 1, 2020. (Pls. Richard Brasser & Greg Gentner's Mot. Summ. J. Pls.' Affirmative

Claims, ECF No. 76; Pls.-Countercl. Defs. Richard Brasser & Greg Gentner's Mot. Summ. J. Def.-Countercl. Pls.' Claims, ECF No. 78.) rFactr filed its Motion for Summary Judgment on the same day. (rFactr, Inc.'s Mot. Summ. J. rFactr, Inc.'s Claims & Def./Countercl. Pls.' Countercls., ECF No. 84.) The McDowells filed their Motion to Strike on June 15, 2020, (Defs.' Br. Supp. Mot. Mot. Strike and/or Preclude Reliance Aff. Luis Gomez, ECF No. 88), and an Amended Motion to Strike on June 29, 2020, (Defs.' Am. Mot. Strike and/or Preclude Reliance Aff. Luis Gomez, ECF No. 96).

19. The Motions have been fully briefed, and a hearing on the Motions was held on August 20, 2020 by videoconference (the "Hearing"), at which all parties were represented by counsel. The Motions are now ripe for resolution.

## III.

## LEGAL STANDARD

20. "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680, 821 S.E.2d 360, 366 (2018) (quoting N.C. R. Civ. P. 56(c)). "[T]he party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985).

21. The party moving for summary judgment may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000) (citations omitted). "If the moving party satisfies its burden of proof, then the burden shifts to the non-moving party to 'set forth *specific facts* showing that there is a genuine issue for trial.'" *Lowe v. Bradford*, 305 N.C. 366, 369–70, 289 S.E.2d 363, 366 (1982) (quoting N.C. R. Civ. P. 56(e)). "[A] genuine issue is one which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534, 180 S.E.2d 823, 830 (1971). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187, 835 S.E.2d 411, 415 (2019) (citation and internal quotation marks omitted). If the nonmoving party does not satisfy its burden, then "summary judgment, if appropriate, shall be entered against [the nonmovant]." *United Cmty. Bank (Ga.) v. Wolfe*, 369 N.C. 555, 558, 799 S.E.2d 269, 271 (2017) (quoting N.C. R. Civ. P. 56(e)).

22. In determining whether the nonmoving party has satisfied its burden, the Court "asks whether reasonable jurors could find by a preponderance of the evidence that the [nonmovant] is entitled to a verdict[.]" *Sloan v. Miller Bldg. Corp.*, 119 N.C. App. 162, 165–66, 458 S.E.2d 30, 32 (1995) (emphasis omitted) (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  In making this determination, "[t]he evidence must be considered 'in a light most favorable to the non-moving party.' " *McCutchen v. McCutchen*, 360 N.C. 280, 286, 624 S.E.2d 620, 625 (2006) (quoting *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004)).

IV.

ANALYSIS

23.     Because it seeks to limit the evidence the Court may consider in connection with the rFactr and Brasser/Gentner Motions, the Court first turns to Defendants' Motion to Strike.

A.     <u>Motion to Strike</u>

24.     Plaintiffs rely upon the affidavit of Jackson National's executive, Luis Gomez ("Gomez Affidavit" or the "Affidavit"), to support the entry of summary judgment on their claims against Defendants.  (*See* Aff. Gomez.)  The McDowells move to strike the Affidavit, contending that the Affidavit (i) contains inadmissible hearsay and speculation, (ii) is protected from Plaintiffs' use by the attorney client privilege, and (iii) was obtained by Plaintiffs in violation of Rule 4.2 of the North Carolina Rules of Professional Conduct.[7]  (*See* Defs.' Br. Supp. Am. Mot. Strike and/or Preclude Reliance Aff. Luis Gomez 6 [hereinafter "Defs.' Br. Supp. Mot. Strike"], ECF No. 97.)

---

[7] *See* N.C. R. Prof'l Conduct 4.2(a) ("During the representation of a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.").

25.     Although Defendants seek to exclude the entirety of the Affidavit or "[a]t the very least, paragraphs 15 through 23," (Defs.' Br. Supp. Mot. Strike 22), it appears that paragraphs 17, 18, 19, and 23 of the Affidavit contain the assertions most germane to the Court's determination of the Motions.  Those paragraphs state, in relevant part, as follows:

> 17. Mr. Bauman informed me that an unknown female recently called Jackson National and provided derogatory information about rFactr.
>
> 18. I understood that the caller informed Jackson National that rFactr was about to be seized by the IRS, that the CEO of rFactr was being investigated for arson of his home, and that the owners of rFactr were removing their children from school and leaving the country.
>
> 19. Based on the information provided by the caller, Ken Bauman advised me not to execute the contract with rFactr. . . .
>
> 23. Jackson National did not enter into the contract with rFactr based on the call it received on October 26, 2017.

(Aff. Gomez ¶¶ 17–19, 23.)

26.     Rule 56(e) of the North Carolina Rules of Civil Procedure ("Rule(s)") requires that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  N.C. R. Civ. P. 56(e).  "[E]vidence set forth in affidavits that would be inadmissible at trial must be stricken and may not be considered by the court in rendering summary judgment." *Hammer v. Hammer*, 179 N.C. App. 408, 411, 633 S.E.2d 878, 881–82 (2006).

27.     Of particular relevance here, " '[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to

prove the truth of the matter asserted." N.C. R. Evid. 801(c). Because "[h]earsay is not admissible except as provided by statute or the Rules of Evidence[,]" *State v. Hinnant*, 351 N.C. 277, 283, 523 S.E.2d 663, 667 (2000) (citing N.C. R. Evid. 802), "[h]earsay matters included in affidavits should not be considered by a trial court in entertaining a party's motion for summary judgment[,]" *Moore v. Coachmen Indus. Inc.*, 129 N.C. App. 389, 394, 499 S.E.2d 772, 776 (1998).

28. In paragraphs 17, 18, and 19, Gomez describes information that Ken Bauman ("Bauman"), a Jackson National attorney, told him regarding an "unknown female['s]" call to Jackson National. (Aff. Gomez ¶ 17.) These statements involve two layers of hearsay: (i) Caroline's statements to Jackson National and (ii) Bauman's statements to Gomez. Plaintiffs argue that none of the statements constitute inadmissible hearsay because they are not offered to prove the truth of the matter asserted; rather, they are offered to explain Gomez's actions in refusing to pursue contract negotiations. (Pls.' Resp. Defs.' Am. Mot. Strike and/or Preclude Reliance Aff. Luis Gomez 13–14, ECF No. 119; rFactr's Mem. Law Opp'n Defs.' Mot. Strike and/or Preclude Reliance Aff. Luis Gomez 16, ECF No. 120.)

29. The Court disagrees. Plaintiffs' briefs make plain that they offer the Affidavit to establish that Caroline's call was the sole reason Jackson National cancelled negotiations and did not enter into a contract with rFactr. (*See, e.g.*, Pls. Richard Brasser & Greg Gentner's Br. Supp. Mot. Summ. J. Pls.' Aff. Claims 6 [hereinafter "Brasser & Gentner's Br. Supp. Affirmative Claims"], ECF No. 82 (citing the Gomez Affidavit to state that "Jackson National did not enter into the contract

with rFactr because of the call from Mrs. McDowell"); Mem. Law Supp. rFactr's Mot. Summ. J. 6 [hereinafter "Mem. Supp. rFactr Mot."], ECF No. 85 (citing the Gomez Affidavit to state that "[a]s a result of Mrs. McDowell's call, Jackson National did not enter into the contract with rFactr").)

30.    Indeed, the Affidavit is the only evidence on which Plaintiffs rely to claim that Caroline's call caused Jackson National to terminate contract negotiations with rFactr.    The Affidavit, however, cannot establish a causal connection between Caroline's call and the termination of contract negotiations unless the Court accepts as true the statements contained in paragraphs 17, 18, and 19.  Not only does Gomez rely on the truth of each of the hearsay statements to support his assertion in paragraph 23 that Jackson National did not enter into a contract with rFactr because of Caroline's call, but those same four paragraphs also make plain that Gomez did not have personal knowledge of Jackson National's purported reason for that decision.    As Gomez avers, "[b]ased on the information provided by the caller," Bauman advised him not to enter the contract with rFactr.  (Aff. Gomez ¶ 19.)  Gomez does not testify that he made the decision to terminate contract negotiations,[8] and even if he had, his Affidavit establishes only that he terminated the negotiations because Bauman advised him to, not because of Caroline's call itself.

---

[8] Indeed, Brasser and Gentner interpret Gomez's affidavit testimony to state that "Mr. Bauman *instructed* Mr. Gomez that . . . he was not to sign [the contract] with rFactr[,]" (Brasser & Gentner's Br. Supp. Affirmative Claims 6 (emphasis added)), making plain their view that Gomez was not Jackson National's decisionmaker concerning a potential contract with rFactr.

31. As such, the Court concludes that paragraphs 17, 18, and 19 constitute inadmissible hearsay, and paragraph 23 reflects inadmissible speculation, neither of which the Court may consider under Rule 56. *See, e.g., Strickland v. Doe*, 156 N.C. App. 292, 295, 577 S.E.2d 124, 128 (2003) ("If an affidavit contains hearsay matters or statements not based on an affiant's personal knowledge, the court should not consider those portions of the affidavit. Similarly, if an affidavit sets forth facts that would be inadmissible in evidence . . . , such portions should be struck by the trial court." (citations omitted)); *see also, e.g., S.C. Telcomms. Grp. Holdings v. Miller Pipeline LLC*, 248 N.C. App. 243, 246, 788 S.E.2d 634, 637 (2016) ("Although a Rule 56 affidavit need not state specifically it is based on personal knowledge, its content and context must show its material parts are founded on the affiant's personal knowledge." (quoting *Hylton v. Koontz*, 138 N.C. App. 629, 634, 532 S.E.2d 252, 256 (2000))). The Court therefore shall grant the McDowells' Motion to Strike as to paragraphs 17, 18, 19, and 23 of the Gomez Affidavit and not consider those paragraphs in connection with the Motions.[9]

B.  Brasser/Gentner Motion

32. Brasser and Gentner argue that Caroline's undisputed statements during her telephone call to Jackson National—both as made to the Jackson National representative who initially took her call and to Mitchell—constitute slander *per se* and establish her liability for defamation as a matter of law. (Brasser & Gentner's

---

[9] In light of the Court's ruling, the Court declines to consider the McDowells' additional grounds to strike the Affidavit. The Court also concludes that, even if it were to consider the Affidavit, the Court's summary judgment rulings herein would remain unchanged.

Br. Supp. Affirmative Claims 8.) Brasser and Gentner further contend that Caroline's statements are attributable to Chris as a matter of law, rendering Chris and Caroline jointly and severally liable on this claim. (Brasser & Gentner's Br. Supp. Affirmative Claims 11.)

33. The McDowells argue in response that there is a genuine dispute as to the falsity and defamatory nature of the statements, that the statements did not cause Brasser or Gentner injury, and that Caroline's statements cannot be imputed to Chris under North Carolina law. (Defs.' Br. Opp'n Pls. Brasser & Gentner's Summ. J. Mot. Defamation Claim 10, 17, 24 [hereinafter "Defs.' Br. Opp'n Brasser & Gentner Mot. Affirmative Claims"], ECF No. 114.1.) The Court addresses the Brasser/Gentner Motion first as to Caroline and then as to Chris.

### 1. Caroline McDowell

34. "In North Carolina, the term defamation applies to the two distinct torts of libel and slander." *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 29, 568 S.E.2d 893, 898 (2002). As relevant here, "[s]lander *per se* is an oral communication to a third party which amounts to . . . an allegation that impeaches the plaintiff in his trade, business, or profession[.]" *Id.* (citation and internal quotation marks omitted). In an action for slander *per se*, "malice and damages are deemed presumed by proof of publication, with no further evidence required as to any resulting injury." *Id.*

35. To succeed on their Motion against Caroline, Brasser and Gentner must each show that (1) Caroline "spoke base or defamatory words which tended to prejudice him in his reputation, office, trade, business or means of livelihood or hold

him up to disgrace, ridicule or contempt;" (2) "the statement was false;" and (3) "the statement was published or communicated to and understood by a third person." *Donovan v. Fiumara*, 114 N.C. App. 524, 532, 442 S.E.2d 572, 577 (1994) (emphasis omitted) (quoting *West v. King's Dept. Store, Inc.*, 321 N.C. 698, 703, 365 S.E.2d 621, 624 (1988)). "When examining an allegedly defamatory statement, the court must view the words within their full context[.]" *Boyce & Isley PLLC*, 153 N.C. App. at 31, 568 S.E.2d at 899. Further, "[w]ith respect to the issue of falsity," the Court must " 'overlook[ ] minor inaccuracies and focus[ ] on *substantial truth*.' As such, '[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the [slanderous] charge be justified.' " *Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21, 67, 846 S.E.2d 647, 675 (2020) (internal quotation marks omitted) (quoting *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516–17 (1991)).[10]

36.     Turning then to the evidence, it is undisputed that Caroline lied when she told Jackson National that she was a former rFactr or Jackson National employee named Susan. (*See* Dep. Caroline 190:3–11, 194:15–195:4 (admitting that these statements were untrue).) While deceptive, these false statements are about

---

[10] *Desmond* applied the "substantial truth" standard to a libel claim. Although the Supreme Court of North Carolina has not yet explicitly extended this same standard to slander claims, other jurisdictions have, and the Court believes the Supreme Court would likely do so if presented the opportunity. *See, e.g.*, *Bruning v. Carroll Cmty. Sch. Dist.*, No. C04-3091-MWB, 2006 U.S. Dist. LEXIS 28718, at *45 (N.D. Iowa May 3, 2006) (applying the rule in a slander case and stating that "the Iowa Supreme Court has recognized substantial truth as a defense in a defamation action"); *Miles v. Ramsey*, 31 F. Supp. 2d 869, 875 (D. Colo. 1998) (applying the rule to slander and stating that " '[s]ubstantial truth' is an affirmative defense to defamation in Colorado"); *Porter v. Sw. Christian Coll.*, 428 S.W.3d 377, 383 (Tex. App. 2014) (examining substantial truth of an allegedly slanderous statement "by considering whether the allegedly defamatory statement was more damaging to the plaintiff's reputation in the mind of the average listener than a truthful statement would have been").

Caroline, not Brasser and Gentner, and, as such, are neither slanderous nor prejudicial to either individual Plaintiff. *See, e.g.*, *Desmond*, 375 N.C. at 41, 846 S.E.2d at 661 (requiring allegedly defamatory statement to be "of or concerning the plaintiff").

37. Similarly, Caroline's statements that rFactr was about to be seized by the IRS or was in trouble with the IRS were about rFactr—not Brasser and Gentner—and thus, even if false, do not permit the Court to conclude as a matter of law that the statements "tend to disgrace and degrade [Brasser and Gentner] or hold [either] up to public hatred, contempt, or ridicule, or cause [either] to be shunned and avoided." *Boyce & Isley PLLC*, 153 N.C. App. at 30–31, 568 S.E.2d at 898–99 (citation omitted); *see also, e.g.*, *Arnold v. Sharpe*, 296 N.C. 533, 539, 251 S.E.2d 452, 456 (1979) ("In order for defamatory words to be actionable, they must refer to some ascertained or ascertainable person and that person must be the plaintiff. If the words used contain no reflection on any particular individual, no averment can make them defamatory.").

38. In addition, the McDowells have offered evidence permitting a reasonable factfinder to conclude that at least Caroline's statement that rFactr was in trouble with the IRS was substantially true because at the time of her call rFactr had substantial IRS debt, (rFactr Investor Update), it had failed to comply with its IRS repayment plan, (Sept. 13, 2017 Text, ECF No. 94.19), and Brasser and Gentner were considering a distressed asset sale in an effort to settle the IRS claims, (Email Oct. 7, 2017, ECF No. 94.7).

39. As to Caroline's alleged statements that are specific to Brasser and Gentner—in particular, that rFactr's owners were in financial trouble, (Dep. Mitchell 16:3–6), rFactr's CEO was under investigation for arson, (Dep. Mitchell 16:8–9, 17:19–18:1; Audio Recording Phone Call), and rFactr's owners had withdrawn their children from school and were leaving the country, (Dep. Mitchell 16:9–11, 19:24–20:15)—the Court cannot conclude that the undisputed evidence of record establishes Caroline's liability for defamation as a matter of law.

40. First, the alleged statement that Brasser and Gentner had removed their children from school and left the country, standing alone, does not disgrace, ridicule, or degrade either and thus does not constitute slander *per se*. Indeed, it is only by weaving Caroline's statement together with "insinuations, innuendo, colloquium, and explanatory circumstances" that Brasser and Gentner contend the statement is base and defamatory. *Nucor Corp. v. Prudential Equity Grp., LLC*, 189 N.C. App. 731, 736, 659 S.E.2d 483, 487 (2008) (requiring for slander *per se* that the allegedly defamatory statement be "stripped of all insinuations, innuendo, colloquium and explanatory circumstances" and "construed only in the context . . . in which they are constrained").

41. In addition, the record evidence, when viewed in the light most favorable to the McDowells, permits a reasonable factfinder to conclude that Caroline's alleged statements concerning the individual Plaintiffs' "financial trouble" and that rFactr's CEO was under investigation for arson were substantially true when made. To that end, the McDowells rely upon affidavit testimony from each individual Plaintiff that

could permit a reasonable jury to conclude that each had some degree of "financial trouble." (*See* Defs.' Br. Opp'n Brasser & Gentner Mot. Affirmative Claims 12; Aff. Gentner ¶¶ 11–12, 35; Aff. Brasser ¶¶ 11–12, 39.) Similarly, the McDowells offer evidence that the Charlotte Fire Department ("CFD") had listed the Brasser fire investigation as "open and active" at the time of Caroline's call, (CFD Investigation Details, ECF No. 82.5), which the Court concludes is sufficient to avoid summary judgment on this aspect of Brasser and Gentner's defamation claim.[11]

42. For each of these reasons, therefore, the Court concludes that Brasser and Gentner's Motion seeking summary judgment on their defamation claim against Caroline should be denied.

### 2. Chris McDowell

43. Brasser and Gentner further contend that Caroline's statements should be imputed to Chris and that each should be held jointly and severally liable as a matter of law. (Brasser & Gentner's Br. Supp. Affirmative Claims 11.) The Court disagrees. While "[i]t is well settled that all who take part in the publication of a [defamatory statement] or who procure or command [defamatory] matter to be published may be sued by the person defamed either jointly or severally[,]" *Desmond v. News & Observer Publ'g. Co.*, 241 N.C. App. 10, 30, 772 S.E.2d 128, 143 (2015), our case law makes clear that to impute the defamatory statement of one to another requires some

---

[11] Defendants also rely on Caroline's deposition testimony that a CFD investigator suggested to her that she should report Brasser's alleged arson to Brasser's insurance company to show that Brasser was under investigation for arson. (Dep. Caroline 252:23–253:8.) This testimony, which is offered for the truth of the investigator's statement, constitutes inadmissible hearsay and will not be considered by the Court.

action by the latter to participate in the former's statement, *see, e.g.*, *Taylor v. Kinston Free Press Co.*, 237 N.C. 551, 552–53, 75 S.E.2d 528, 529–30 (1953) (citing cases in which the defendant actively and voluntarily published the allegedly defamatory statement).

44. This rule makes sense because joint and several liability in tort requires that a defendant act in concert with another tortfeasor. *See, e.g.*, *Bowen v. Iowa Nat'l Mut. Ins. Co.*, 270 N.C. 486, 491–92, 155 S.E.2d 238, 242–43 (1967) ("In the case of joint tort-feasors, although there is a single damage done, there are several wrongdoers. The act inflicting injury may be single, but back of that, and essential to liability, lies some wrong done by each tort-feasor contributing in some way to the wrong complained of."); *White v. Keller*, 242 N.C. 97, 100, 86 S.E. 2d 795, 797 (1955) ("Joint tort-feasors are those who act together in committing a wrong, or whose acts, if independent of each other, unite in causing a single injury.").

45. Brasser and Gentner argue that Chris engaged in the requisite action here by allowing his wife "unfettered access" to his emails and not preventing her from overhearing his confidential conversations; in sum, that Chris "took no steps to prevent his wife from . . . sharing false information[.]" (Brasser & Gentner's Br. Supp. Affirmative Claims 12.) Chris's failure to act, they contend, "caused and procured the slanderous material that [Caroline] communicated to Jackson National." (Brasser & Gentner's Br. Supp. Affirmative Claims 12.) The Court is not persuaded. Chris has offered substantial evidence that he was unaware of Caroline's plan to call Jackson National and did not otherwise knowingly participate in the

making of her allegedly defamatory statements. (*See* Aff. Chris ¶¶ 22–23.) Such evidence is enough to preclude the entry of summary judgment on this claim against Chris.

## C. Brasser/Gentner Counterclaim Motion

46. The McDowells assert three counterclaims against Brasser and Gentner: (i) breach of fiduciary duty, (ii) constructive fraud, and (iii) fraudulent misrepresentation. (*See* Compl. ¶¶ 119, 128, 137.) The McDowells frame their claims as direct, rather than derivative, and contend that Brasser and Gentner owed them a special duty under North Carolina law. Plaintiffs seek summary judgment on each counterclaim, contending that neither Chris nor Caroline has standing to assert the counterclaims. (Pls. Richard Brasser & Greg Gentner's Br. Supp. Mot. Summ. J. Defs.' Countercls. 1 [hereinafter "Br. Supp. Brasser/Gentner Countercl. Mot."], ECF No. 83.) The Court addresses each Defendant's standing in turn.

### 1. Caroline McDowell

47. Brasser and Gentner contend that Caroline lacks standing to assert her counterclaims because she is not now nor has she ever been a shareholder of rFactr. (Br. Supp. Brasser/Gentner Countercl. Mot. 4.) The thrust of their argument is that they cannot be liable for breach of fiduciary duty or constructive fraud because, as majority shareholders, they owe no fiduciary duty to Caroline, a non-shareholder, nor for fraud because Caroline did not purchase any Company shares and thus neither

relied upon nor suffered injury from any of their allegedly fraudulent misrepresentations.

48. Caroline argues in response that she has standing to assert her claims both because she is and has been a shareholder and because, in any event, Brasser and Gentner owed her a fiduciary duty based on the "parties' friendship and the confidence reposed in Plaintiffs by the McDowells when choosing to invest in rFactr." (Defs.' Br. Opp'n Pls.' Summ. J. Mots. Countercls. 8 [hereinafter "Defs.' Br. Opp'n Brasser/Gentner Countercl. Mot."], ECF No. 109.)

49. The North Carolina Business Corporation Act defines a "shareholder" as "the person in whose name shares are registered in the records of a corporation or the beneficial owner of shares to the extent of the rights granted by a nominee certificate on file with a corporation." N.C.G.S § 55-1-40(22). Here, it is undisputed that Caroline has never appeared as a shareholder on the books of either Targeted Group or rFactr and that the Company has no nominee certificate on file showing that Caroline is the beneficial owner of any Company shares. (Aff. Brasser ¶ 38.) It is also undisputed that the stock certificate Targeted Group issued for the shares at issue clearly identifies Chris, not Caroline, as the owner of the shares. (TGI Certificate.) Similarly, when Targeted Group was rebranded as rFactr, the Company issued rFactr shares to Chris, not Caroline. (rFactr Certificate.)

50. Caroline argues that the Company's failure to include her name on the stock certificate for the shares at issue is not dispositive, and she offers evidence showing that she and Chris intended for each investment in rFactr to be jointly held and that

the funds for each investment were paid from their joint account. (Defs.' Br. Opp'n Brasser/Gentner Countercl. Mot. 8; Aff. Chris ¶¶ 3–4.) She also relies on Brasser's statements to Chris that "you and Caroline will be really happy with this investment" and "you guys will be psyched" as establishing that Brasser "explicitly acknowledged that the McDowells' investment was jointly-held." (Defs.' Br. Opp'n Brasser/Gentner Countercl. Mot. 7; Dep. Chris 323:3–13.) Caroline contends this showing is sufficient to avoid summary judgment for lack of standing. The Court disagrees.

51. While it is true that "issuance or possession of [stock] certificates is not dispositive of one's rights or standing as a stockholder[,]" *Sessions v. Five "C's," Inc.*, No. COA10-1426, 2011 N.C. App. LEXIS 1217, at *6 (N.C. Ct. App. June 21, 2011), and thus that the issuance of the stock certificates in Chris's name alone "constitutes only *prima facie* evidence of the ownership" of those shares, *Meisenheimer v. Alexander*, 162 N.C. 226, 235, 78 S.E. 161, 164 (1913), Caroline offers no evidence that she was ever registered in the Company's records as the direct or beneficial owner of the Company's shares. Nor does she point to any corporate resolution or other action authorizing that shares be issued in her name, offer evidence suggesting that she or Chris directed the Company to issue the shares in both of their names, or otherwise put the Company on notice of their intention to jointly hold the shares. Similarly, she offers no evidence that she or Chris ever took any action to correct or change the stock certificates reflecting that Chris was the sole owner of the shares after the shares were issued.

52. In short, Caroline offers no evidence to support her claim other than her and Chris's current testimony stating that joint ownership was their intention at the time of purchase. That she and Chris intended to jointly own the shares at issue, however, does not, without more, mean that they did so. Similarly, Brasser's statements do not permit a reasonable jury to conclude either that Caroline was a shareholder of the Company or even that the Company knew that the McDowells intended the investment to be jointly held. The Court therefore concludes on this record that Defendants have failed to bring forward evidence upon which a reasonable factfinder could conclude that Caroline was ever a shareholder in the Company.

53. Caroline further argues that even if she is not a shareholder, Brasser and Gentner "owed [her] a fiduciary duty to act in her best interests with respect to the investments of the McDowells' funds." (Defs.' Br. Opp'n Brasser/Gentner Countercl. Mot. 8.) Again, the Court disagrees. "North Carolina recognizes two types of fiduciary relationships: *de jure*, or those imposed by operation of law, and *de facto*, or those arising from the particular facts and circumstances constituting and surrounding the relationship." *Hager v. Smithfield E. Health Holdings, LLC*, 264 N.C. App. 350, 355, 826 S.E.2d 567, 571, *disc. review denied*, 373 N.C. 253, 835 S.E.2d 446 (2019). Caroline offers no evidence or argument to contend she stands in a *de jure* fiduciary relationship with Brassser and Gentner; rather, she claims a *de facto* fiduciary relationship arising from the parties' relationship. (Defs.' Br. Opp'n Brasser/Gentner Countercl. Mot. 8–9.)

54.     Under North Carolina law, "[a] [*de facto*] fiduciary relationship may arise where 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.'" *Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013) (internal quotation marks omitted) (quoting *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001)). However, "[t]he standard for finding a *de facto* fiduciary relationship is a demanding one: '[o]nly when one party figuratively holds all the cards . . . have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen.'" *Hager*, 264 N.C. App. at 356, 826 S.E.2d at 572 (quoting *Lockerman v. S. River Elec. Membership Corp.*, 250 N.C. App. 631, 636, 794 S.E.2d 346, 352 (2016)). "Determining whether a fiduciary relationship exists requires looking at the particular facts and circumstances of a given case." *Highland Paving Co. v. First Bank*, 227 N.C. App. 36, 42, 742 S.E.2d 287, 292 (2013) (citation omitted).

55.     To show a fiduciary relationship here, Caroline cites evidence that the McDowells had been friends with Brasser and Gentner for years and that they relied on Brasser's representations regarding rFactr when they decided to invest in the Company. (*See, e.g.*, Aff. Chris ¶¶ 5, 7, 9; Aff. Caroline McDowell ¶¶ 5–6, ECF No. 105.) Evidence of friendship and general reliance, however, falls far short of showing that Brasser and Gentner "figuratively h[eld] all the cards" in her relationship with them. *See, e.g.*, *Painter v. Doe*, No. 3:15-cv-00369-MOC-DCK2016, U.S. Dist. LEXIS 119958, at *25 (W.D.N.C. Sept. 6, 2016) (holding under North Carolina law that

"[t]here simply is no case law that would support imposition of such a [fiduciary] relationship based on a friendship or even an intimate friendship"). This is particularly so here, where there is no evidence that Chris or Caroline were pressured to invest funds in the Company, were denied the opportunity to conduct necessary due diligence prior to the investment, or were otherwise engaged in something other than an arm's length transaction with Targeted Group or rFactr. As such, the Court concludes that the undisputed facts of record establish as a matter of law that neither Brasser nor Gentner owed Caroline a fiduciary duty during the period at issue in this litigation.

56. Having concluded that Caroline was neither a shareholder of Targeted Group or rFactr nor one to whom Brasser and Gentner owed a fiduciary duty, the Court concludes that Caroline lacks standing to bring her counterclaims against these Plaintiffs. Caroline's counterclaims against Brasser and Gentner for breach of fiduciary duty, constructive fraud, and fraudulent misrepresentation shall therefore be dismissed.

### 2. Chris McDowell

57. Brasser and Gentner contend that Chris's claims belong to the Company and thus are derivative, not direct, requiring dismissal. Under North Carolina law, "[t]he well-established general rule is that shareholders cannot pursue individual causes of action against third parties for wrongs or injuries to the corporation that result in the diminution or destruction of the value of their stock." *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997). As applied here, this

general rule would require dismissal of Chris's purported claims because they arise from his investment loss and would appear " 'identical to the injury suffered by' the corporate entity as a whole."  *Green*, 367 N.C. at 144, 749 S.E.2d at 269 (quoting *Energy Invs. Fund, L.P. v. Metric Constructors, Inc.*, 351 N.C. 331, 336, 525 S.E.2d 441, 444 (2000)).

58.     However, "[t]here are two major, often overlapping, exceptions" to the general rule that a shareholder cannot sue for injuries to the corporation: "(1) where there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder, and (2) where the shareholder suffered an injury separate and distinct from that suffered by other shareholders."  *Barger*, 346 N.C. at 658, 488 S.E.2d at 219 (citation omitted).  Of particular relevance to this case, both a special duty and a separate and distinct injury have been found where a corporate actor's fraudulent misrepresentations induced the plaintiff to purchase the corporation's shares.  *See, e.g.*, *id.* at 659, 488 S.E.2d at 220 ("A special duty . . . has been found when the wrongful actions of a party induced an individual to become a shareholder[.]"); *Newton v. Barth*, 248 N.C. App. 331, 340, 788 S.E.2d 653, 661 (2016) (holding a direct action may lie where a plaintiff "*never would have suffered any injury* if they had not been fraudulently induced" into making the investment); *see also, e.g.*, *Howell v. Fisher*, 49 N.C. App. 488, 498, 272 S.E.2d 19, 26 (1980) ("[A] corporation is not a necessary party when stockholders seek damages in their own right for negligent misrepresentations made to them before they were stockholders for the purpose of inducing their investment.").

59. Here, Chris offers evidence to support his claims for breach of fiduciary duty, constructive fraud, and fraudulent misrepresentation that would permit a reasonable factfinder to conclude that he would never have initially invested in the Company had he known that Brasser's representation that Amway was a customer was false, (Dep. Chris 53:22–55:8; Aff. Chris ¶¶ 6–7), or made a second investment had Brasser revealed the Company's substantial tax liabilities and been truthful concerning the Company's financial situation in response to Chris's direct questions, (Aff. Chris ¶¶ 10–11). Accordingly, Chris has offered sufficient evidence to show both that Brasser wrongfully induced him to invest in the Company, thereby creating a special duty under *Barger*, 346 N.C. at 659, 488 S.E.2d at 220, and that but for Brasser's inducement, he "never would have suffered any injury[,]" *Newton*, 248 N.C. App. at 340, 788 S.E.2d at 661 (emphasis omitted), permitting a reasonable factfinder to conclude that he suffered an injury "separate and distinct from that suffered by other shareholders[,]" *Barger*, 346 N.C. at 658, 488 S.E.2d at 219 (citation omitted).

60. As a result, the Court concludes that Brasser and Gentner's motion seeking dismissal of Chris's claims for lack of standing should be denied. *See Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 397, 537 S.E.2d 248, 254 (2000) (recognizing a direct action exists "to recover damages from an 'insider' or other party who induced him to buy or sell shares in the corporation either by actual misrepresentations or by failing to disclose pertinent information about the corporate affairs in breach of a fiduciary obligation" (citations omitted)).

D.   rFactr Motion

1.   For Judgment on rFactr's Claims

61.   rFactr argues that it is entitled to summary judgment on each of its claims. (Mem. Supp. rFactr Mot. 1.)  The Court considers each claim in turn.

i.   Tortious Interference with Prospective Economic Advantage

62.   A claim for tortious interference with prospective economic advantage exists where a party "interferes with a business relationship 'by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, . . . if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights.' " *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 701, 784 S.E.2d 457, 463 (2016) (quoting *Spartan Equip. Co. v. Air Placement Equip. Co.*, 263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965)).

63.   rFactr argues that summary judgment should be entered on this claim because it is undisputed that Caroline's statements to Jackson National caused it to "change course and refrain from entering a contract with rFactr that it otherwise would have." (Mem. Supp. rFactr Mot. 8.)  The only evidence rFactr offers in support, however, are the stricken paragraphs of the Gomez Affidavit.  (*See* Mem. Supp. rFactr Mot. 8.)   Separately, the McDowells have also offered evidence from which a reasonable factfinder could conclude that Jackson National terminated negotiations with rFactr for reasons other than Caroline's call, including rFactr's substantial tax liabilities, which were a matter of public record.  (*See* Br. Opp'n Mot. Summ. J. by

rFactr 6, 9 [hereinafter "Br. Opp'n rFactr Mot."], ECF No. 114.2; Oct. 27 Email; *see also* Brasser & Gentner's Br. Supp. Affirmative Claims 9 (admitting that "[a]n IRS lien is a public document").) For both of these reasons, therefore, the Court concludes that summary judgment on this claim should be denied.

### ii. Breach of Fiduciary Duty

64. rFactr also seeks summary judgment on its breach of fiduciary duty claim against Chris, its corporate director at all relevant times. Chapter 57D of the North Carolina General Statutes provides that "an LLC's managers and company officials owe fiduciary duties to the LLC to discharge their duties in good faith, with the care of an ordinary prudent person, and in the best interests of the LLC." *Timbercreek Land & Timber Co. v. Robbins*, 2017 NCBC LEXIS 64, at *12 (N.C. Super. Ct. July 28, 2017) (citing N.C.G.S. § 57D-3-21(b)). rFactr contends that the undisputed evidence shows that because Chris allowed Caroline to access rFactr's confidential information through "email[ ], conversations and business calls on speaker phone," he acted in "complete disregard for his duty to act in good faith . . . and in rFactr's best interests" as a matter of law. (Mem. Supp. rFactr Mot. 10.)

65. Setting aside whether Chris's alleged inaction can establish a breach of fiduciary duty under North Carolina law, the parties offer conflicting evidence concerning Chris's knowledge of any conduct by Caroline that resulted in injury to rFactr. First, it is undisputed that Chris gave Caroline access to his email account, (Dep. Chris 11:21–14:1; Dep. Caroline 146:17–21), and conducted conference calls by speaker phone at his home within Caroline's hearing, (Dep. Chris 14:2–15:4; Dep.

Caroline 129:15–130:12), each of which permitted Caroline to learn rFactr's confidential information, (Dep. Chris 19:15–21:2; Dep. Caroline 129:5–130:12). The McDowells, however, offer evidence that Caroline took measures that prevented Chris from learning that she was secretly reading his work emails "with regularity[,]" (Dep. Caroline 139:1–142:13), including by marking those emails as "unread" after reading them, (Dep. Caroline 328:21–24). Caroline also testified that she lied about her identity in the call to Jackson National so that Chris would not find out that she had made the call. (Dep. Caroline 192:11–193:12.) For his part, Chris testified that he was unaware of the extent of Caroline's activity, including in connection with her call to Jackson National, averring that he did not know the call took place until a couple of months thereafter. (Aff. Chris ¶¶ 22–23; Dep. Chris 185:10–22.) Chris also offers evidence that Plaintiffs were aware that Caroline overheard Chris's calls but did not object or otherwise direct Chris to exclude Caroline from learning rFactr's confidential business information. (Dep. Chris 11:21–14:22.)

66. Viewing the evidence in the light most favorable to the McDowells, the Court concludes that Plaintiffs' motion for entry of judgment on this claim should be denied.

### iii. Unfair or Deceptive Trade Practices

67. rFactr seeks summary judgment on its Chapter 75 claim, contending that the undisputed evidence shows that the McDowells engaged in unfair and deceptive trade practices because Chris "conceal[ed] that he knew what [Caroline] did using information that he improperly gave her[,]" and Caroline "fabricat[ed] her identity

and provid[ed] false information to Jackson[.]" (Mem. Supp. rFactr Mot. 12.)[12] The Court has already determined, however, that an issue of fact remains concerning Chris's knowledge of Caroline's allegedly wrongful activities and whether Caroline's statements to Jackson National were substantially true and/or caused Jackson National to terminate contract negotiations with rFactr. As a result, the Court concludes that summary judgment is not properly entered for rFactr on its Chapter 75 claim.[13]

### 2. Counterclaims

68. rFactr argues that it is entitled to summary judgment dismissing each of the McDowells' counterclaims as a matter of law. (Mem. Supp. rFactr Mot. 13.)

### i. Breach of Contract

69. rFactr contends that Chris's breach of contract claim should be dismissed because the claim is "based on the incorrect assertion that he is the holder of a [n]ote issued by rFactr pursuant to a Note Agreement." (Mem. Supp. rFactr Mot. 13; *see also* Answer ¶¶ 110–18.) rFactr describes evidence suggesting that although Chris sent a $25,000 wire transfer to rFactr, "he did not actually receive any such note or

---

[12] "To prevail on a claim of unfair and deceptive trade practices, a plaintiff must show: (1) defendants committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that plaintiff was injured thereby." *First Atl. Mgmt. Corp. v. Dunlea Realty Co.*, 131 N.C. App. 242, 252, 507 S.E.2d 56, 63 (1998). "[D]eliberate acts of deceit or bad faith do not have to be shown," but rather that "the act possessed the tendency or capacity to mislead, or created the likelihood of deception." *Boyd v. Drum*, 129 N.C. App. 586, 593, 501 S.E.2d 91, 97 (1998) (citation and internal quotation marks omitted).

[13] In light of the Court's rulings, the Court declines to consider the McDowells' additional arguments asserting that rFactr has failed to show proximate cause or damages as a matter of law. (Br. Opp'n rFactr Mot. 21, 27.)

loan documents, and does not have a certificate from rFactr 'of any sort.' "[14] (Mem. Supp. rFactr Mot. 13 (citing Dep. Chris McDowell 238:2–8).) Thus, rFactr claims there is no contract between Chris and the Company, requiring dismissal of Chris's claim.

70. Chris offers evidence in response that he loaned rFactr $25,000, (Aff. Chris ¶ 4),[15] and that a June 18, 2017 email from Gentner to Brasser, Chris, and others shows that Chris had a contract with the Company for repayment with interest, (Email & Convertible Note Conversion Calculation, ECF No. 94.21; Defs.' Br. Opp'n Brasser/Gentner Countercl. Mot. 15–16). The email indicates that Gentner created a "Convertible Note Calculation Spreadsheet" and under the heading "rFactr Convertible Note Offering" lists Chris as the holder of a $25,000 convertible note created June 9, 2015. (Email & Convertible Note Conversion Calculation.) The spreadsheet also includes a table calculating interest rates as of a September 1, 2017 date of conversion. (Email & Convertible Note Conversion Calculation.) The Court concludes that this evidence is sufficient to create a triable issue on Chris's breach of contract claim. Summary judgment for rFactr must therefore be denied.[16]

---

[14] The Court notes that rFactr failed to attach the cited pages of Chris's deposition to its motion or supporting brief and that the separate attachment it cites to does not include the referenced pages.

[15] While rFactr bases its motion on Chris's failure to offer written evidence of a loan, it is not clear whether rFactr disputes that Chris wired $25,000 to the Company with the expectation of repayment. (*See* Mem. Supp. rFactr Mot. 13.) In contrast, Brasser and Gentner acknowledge that Chris's wire of funds was a loan to the Company. (Br. Supp. Brasser/Gentner Countercl. Mot. 2 ("Mr. McDowell made an additional loan of $25,000.00 to rFactr[.]").)

[16] As pleaded, the McDowells allege that rFactr breached a contract with Chris, not Caroline, (Compl. ¶¶ 111–17), but appear to bring the claim jointly as they allege they both incurred

## ii. Shareholder Inspection

71.     rFactr seeks dismissal of the McDowells' claim for shareholder inspection under N.C.G.S. § 55-16-01 because (i) Caroline is not a shareholder entitled to inspect corporate records, and (ii) the McDowells received "all information they requested" during discovery, thus mooting the claim. (Mem. Supp. rFactr Mot. 13.) The McDowells did not respond to rFactr's Motion on this claim in their response brief or at the Hearing. Where, as here, a party against whom summary judgment is sought fails to respond to the opposing party's motion, "summary judgment, if appropriate, shall be entered against him." N.C. R. Civ. Pro. 56(e); *see also, e.g.*, *G & S Bus. Servs., Inc. v. Fast Fare, Inc.*, 94 N.C. App. 483, 486–87, 380 S.E.2d 792, 794 (1989) (affirming summary judgment where the nonmovant failed to respond to the motion with supporting materials). The McDowells' failure to respond in the circumstances here suggests that they concede their inspection claim should be dismissed as moot. In any event, the Court concludes, based on the undisputed evidence of record, that dismissal on mootness grounds is proper as a matter of law.[17]

---

damages from the alleged breach, (Compl. ¶ 118). It is undisputed that Caroline did not enter a contract with rFactr concerning Chris's wire of $25,000, and Caroline is not alleged to have been a third-party beneficiary of Chris's contract with rFactr. (*See* Email & Convertible Note Conversion Calculation.) The Court therefore concludes that, to the extent Caroline asserts a breach of contract claim against rFactr arising from Chris's wire transfer, that claim should be dismissed.

[17] The Court also notes that Caroline's claim for shareholder inspection must fail for the separate reason that, as discussed *supra*, she has failed to offer evidence showing that she was ever a shareholder of rFactr. *See* N.C.G.S. § 55-16-02 (providing for records that "shareholders" may inspect).

### iii. Constructive Fraud

72. rFactr's Motion seeks dismissal of the McDowells' claim for constructive fraud on the same lack of standing grounds argued by Brasser and Gentner in their Counterclaim Motion. (Mem. Supp. rFactr Mot. 13–16.) The Court concludes that rFactr's Motion raising the same contention should be treated in the same way and thus that the Motion should be granted as to Caroline's claim and denied as to Chris's claim for the reasons previously discussed in resolving the Brasser/Gentner Counterclaim Motion.

### V.

### CONCLUSION

73. **WHEREFORE**, based on the foregoing, the Court hereby **ORDERS** as follows:

   a. The McDowells' Motion to Strike is **GRANTED** as to paragraphs 17, 18, 19, and 23 of the Gomez Affidavit, and those paragraphs are hereby stricken from the Affidavit and shall not be considered on the Motions;

   b. The Brasser/Gentner Motion is hereby **DENIED**, and Brasser and Gentner's defamation claim shall proceed to trial;

   c. The Brasser/Gentner Counterclaim Motion is **GRANTED** as to Caroline's counterclaims for breach of fiduciary duty, constructive fraud, and fraudulent misrepresentation, and those claims are hereby **DISMISSED with prejudice**, and **DENIED** as to Chris's

counterclaims for breach of fiduciary duty, constructive fraud, and fraudulent misrepresentation, and those counterclaims shall proceed to trial;

d. The rFactr Motion is **GRANTED** as to Caroline's breach of contract and constructive fraud counterclaims, and the McDowells' shareholder inspection counterclaim, and those claims are **DISMISSED with prejudice**, and **DENIED** as to rFactr's claims for tortious interference with prospective economic advantage, breach of fiduciary duty, and unfair and deceptive trade practices, and as to Chris's counterclaims for breach of contract and constructive fraud, and those claims shall proceed to trial.

**SO ORDERED**, this the 8th day of December, 2020.


/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge